[Civ. No. 40616. Second Dist., Div. Five. Oct. 4, 1973.]

Estate of GEORGE N. SPIRTOS, Deceased.
TULLA SPIRTOS, as Former Administratrix, etc.,
Petitioner and Appellant, v.
JAMES S. MIZE, as Public Administrator, etc., et al.,
Objectors and Respondents.

## COUNSEL

Jones & Wilson, James T. Hudson and William F. Flahavan for Petitioner and Appellant.

John D. Maharg, County Counsel, Edward G. Pozorski, Deputy County Counsel, and Willard J. Stone for Objectors and Respondents.

## OPINION

**STEPHENS, Acting P. J.**—This appeal is from an order surcharging appellant Tulla Spirtos (the removed administratrix of the estate of her husband, George N. Spirtos) in the total amount of $117,841.76. Also, a motion to dismiss appeal was filed by respondents.

George N. Spirtos died intestate[1] on August 8, 1966, survived by his

---

[1] In her opening brief on appeal, appellant states: "All of the property forming a part of the estate was the community property of appellant and decedent, and appellant is the sole person entitled to distribution thereof." Both respondents take issue with this allegation. In paragraph V, page 4, of appellant's "Final Accounting of Removed Administratrix, etc." filed on March 8, 1971, appellant states: "It has not been determined whether the Estate is entirely community property or a combination of community property, quasi-community, and separate property. There has been no determination of who the heirs at law are of this estate." This issue is yet to be resolved.

wife, Tulla, and four children. On August 10, 1966, appellant filed her petition for letters of administration, alleging that she was decedent's wife; that four children issued from the marriage; and that the total estimated assets of decedent consisted of cash ($5,000), personal property (consisting mainly of decedent's medical practice) ($59,000), and annual income from other sources ($1,000), amounting to $65,000. On August 24, 1966, an order appointing her as special administratrix was issued and the qualifying bond was set at $65,000.

By written agreement dated September 16, 1966, appellant sold decedent's medical practice to Doctor Cuilty for $122,000, payable at $25,000 down and the balance in equal monthly payments of $1,464.02, carrying interest at 7 percent per annum. No security for the unpaid balance was obtained from Cuilty. No notice of the sale was either posted or published, and no attempt was made to obtain court approval of the sale. Appellant received the $25,000 down payment and 13 monthly payments thereafter, for a total of $44,032. Cuilty was subsequently adjudicated a bankrupt, and the claim for the balance owing to the estate was discharged, thus resulting in a loss to the estate of $78,468.

On May 5, 1967, an inventory and appraisement was filed showing assets totaling $123,500, which included the medical practice appraisal at its sales price. On February 5, 1969, pursuant to a petition by respondent-creditor Lindsay (whose claim had been approved but remained unpaid), a citation to compel an accounting (Prob. Code, §§ 921 and 922) was issued and served. On May 27, 1969, a first account current and petition for settlement were filed on behalf of appellant by her attorneys.[2] In this accounting, appellant charged herself with amounts for the inventory, supplemental inventory, and receipts from the practice prior to the sale to Cuilty, and claimed that the sales price for the medical practice, except for that portion thereof received ($44,032), was now uncollectible due to Cuilty's bankruptcy. By this first account current, appellant first raised the grounds upon which she now seeks reversal, i.e., that "Upon the advice and instructions of said former attorney, Tulla Spirtos executed, Exhibit I hereto [the sales agreement with Cuilty]." At the hearing of objections by respondent-creditor Lindsay to this account, counsel for appellant orally asked the court to approve the sale of the practice. The

[2]Appellant's original attorneys, Caras and Evangelatos, were retained immediately after the death of decedent, and served until September 30, 1968. Appellant was next represented by Dicker & Dicker until August 29, 1969, when G. Dana Hobart was substituted as attorney of record for appellant. On March 12, 1970, Allen L. Levine was substituted as attorney of record for appellant.

court refused to approve the account or confirm the sale of the medical practice,[3] and Lindsay's objections were sustained.

On March 12, 1970, appellant filed a first and final account. Objections to this account were again filed by respondent Lindsay. After a hearing, the objections were sustained and appellant was surcharged in the amount of $105,185.19. This order, however, was set aside on the ground that two tax claims had been omitted from the first and final account. Appellant thereafter filed a supplemental accounting.

On January 8, 1971, pursuant to a petition by respondent Lindsay for removal of the administratrix and for appointment of a successor adminis-

---

[3]Probate Code, section 755: "Except as provided by sections 770 and 771 of this code all sales of property must be reported to the court and confirmed by the court before the title to the property passes. The report must be verified. Such report and a petition for confirmation of the sale must be made within thirty days after each sale. . . ."

Probate Code, section 770: "Perishable property and other personal property which will depreciate in value if not disposed of promptly, or which will incur loss or expense by being kept, and so much other personal property as may be necessary to provide the family allowance pending the receipt of other sufficient funds, may be sold without notice, and title shall pass without confirmation; but the executor, administrator or special administrator is responsible for the actual value of the property *unless, after making a sworn return, and on a proper showing, the court shall approve the sale.*" (Italics added.)

Probate Code, section 772: "Except as provided in Sections 757, 770, and 771 of this code, personal property may be sold only after notice posted at the courthouse of the county in which the proceedings are pending at least 10 days before the sale or, in case of a private sale, at least 10 days before the day on or after which the sale is to be made; or by publication pursuant to Section 6063a of the Government Code in a newspaper in such county, or by both, as the executor or administrator may determine. If it is shown that it will be for the best interests of the estate, the court may shorten the time of notice to no less than five days, and such notice must then be posted, or published pursuant to Section 6061 of the Government Code in the county in which the proceedings are pending, at least five days before the sale, or, in the case of a private sale, at least five days before the day on or after which the sale is to be made. . . . [¶] Title to tangible personal property sold at public sale passes upon receipt of the purchase price and delivery of the property to the buyer but the executor or administrator is responsible for the actual value of the property *unless, after making a sworn return, and on proper showing, the court shall approve the sale.*" (Italics added.)

Probate Code, section 773: "Personal property may be sold for cash, or upon a credit. If a sale is made upon a credit, not less than twenty-five per cent of the purchase price shall be paid in cash at the time of sale. The executor or administrator shall take the note of the purchaser for the balance of the purchase money, with a pledge or chattel mortgage of the personal property sold, to secure the payment of said balance, or shall enter into a conditional sale contract under which title is retained until such balance is paid, the terms of said note and pledge or chattel mortgage or contract to be approved by the court at the time of confirmation of sale."

trator, an order revoking appellant's letters of administration was filed and on March 4, 1971, the public administrator was appointed as her successor.

On March 8, 1971, the removed administratrix filed her final account. Objections were again filed by respondent Lindsay, and were joined in by the public administrator. On November 11, 1971, the order sustaining objections to the final account corrected the accounting to show charges in favor of the estate in the amount of $151,518.23, and credits in favor of appellant in the amount of $33,676.47; appellant was surcharged for the amount of the difference, $117,841.76. The order also denied appellant's claim for statutory commissions and fees and ordered that the following claims be paid out of the funds to be received by the public administrator:

| | |
|---|---:|
| Owen W. Lindsay | $22,000.00 |
| Marie Hellman | 434.00 |
| Franchise Tax Board, together with interest as allowed by law | 4,284.19 |
| Internal Revenue Service, together with interest as allowed by law | 5,726.33 |
| James M. Hall, Inheritance Tax Appraiser | 4.24 |
| Stuart S. Rough & Associates, Bond Premium | 182.00 |

These obligations, totaling $32,630.76, are the only outstanding obligations of the estate, other than statutory commissions and fees owed to appellant, her attorneys, and the successor administrator and his attorney.

### Facts Relating to the Surcharge

The transactions which resulted in the surcharge to appellant arose as a result of appellant's placing the management of the estate in the hands of her first attorneys, Caras and Evangelatos. Appellant testified that she had no knowledge of the legal steps necessary to probate an estate. At the time of decedent's death, appellant was advised by her counsel that the major asset of the estate (decedent's medical practice, weight reduction) had to be sold immediately as otherwise the patients would go elsewhere and within a month the practice would be worth nothing. Complicating the situation was the position of the lessor of the property upon which the weight-reduction facility was located; he was contending that decedent's death had terminated the lease and was threatening to bring in his own doctor and take over the medical practice. Evangelatos began

negotiations with the lessor for the sale of the medical practice, and received an offer of $37,500 from the lessor. On August 24, 1966, after appellant's appointment as special administratrix, she and Evangelatos took control of the medical practice and at that time both felt that a quick sale was necessary because they were afraid that they would be evicted at any moment. Within a few days appellant found a new location for the practice, leased it for a term of three years at a total rent of $10,950, and made improvements and expenditures amounting to $15,000. Thereafter, appellant found Doctor Cuilty, who agreed to purchase the practice and move it to the new location, and Evangelatos negotiated the sale according to the terms above set forth.[4]

Evangelatos' reasons for not giving notice of sale and not opening the subject-practice to public bid were: (1) he felt that if a petition were filed with the court, the original landlord would learn of it and immediately evict them; and (2) Cuilty wanted immediate possession so that he could familiarize himself with the practice prior to moving to the new location. Cuilty subleased the new premises; however, he never occupied them, but remained at decedent's old location until Cuilty was adjudicated a bankrupt.

### Contentions

■ Before we undertake to discuss the merits of appellant's contentions on appeal, we must resolve the validity of respondents' contention that the doctrine of res judicata bars appellant from litigating the question of liability for the loss occasioned by the sale to and subsequent bankruptcy of Cuilty. Respondents' contention is premised on the argument that the issues now raised by appellant were initially raised at the time the first account current was stated; that the contentions of appellant were rejected at that time by the trial judge; and that since the order denying the first account current was appealable, the order is now final and bars further litigation of the issue of appellant's liability for the loss caused by the sale of the medical practice and Cuilty's subsequent bankruptcy.

Respondents, however, contend that the order sustaining the objections to the first account current implicitly operated as a refusal to confirm the

---

[4]According to appellant, the sale to Cuilty necessitated the securing of a lease at a different location and substantial expenditures for refurbishing. Respondent Lindsay attacked these disbursements on the grounds that they were speculative and dissipated assets of the estate. Appellant contends that they were made upon the advice of her counsel and therefore, whether or not she should be surcharged therefor must be resolved under the same principles that govern the determination of appellant's liability for the loss engendered by the sale itself.

sale of the medical practice to Cuilty and, as such, the order was appealable pursuant to Probate Code section 1240. Unfortunately for respondents, this would not resolve the matter for even if the court's refusal to confirm the sale was appealable, it did not bar appellant from litigating the issue of her liability for the surcharge. ■ The doctrine of res judicata has two aspects: (1) it precludes parties or their privies from relitigating a cause of action that has finally been determined by a court of competent jurisdiction; and (2) any issue necessarily decided in such litigation is conclusively determined as to the parties or the privies if it is involved in subsequent litigation on a different cause of action. (*Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.,* 58 Cal.2d 601, 604 [25 Cal.Rptr. 559, 375 P.2d 439]. ■ As stated in *Todhunter* v. *Smith,* 219 Cal. 690, 694-695 [28 P.2d 916]: ". . . By virtue of the doctrine of *res judicata* the final determination of a court of competent jurisdiction necessarily affirming the existence of any fact is conclusive evidence of the existence of that fact when it is again in issue in subsequent litigation between the same parties in the same or any other court. The facts decided in the first suit cannot be disputed or relitigated although the later suit is upon a different cause of action."

■ The question thus to be resolved is whether the order by the trial judge implicitly refusing to confirm the sale of the medical practice to Cuilty adjudicated that appellant was negligent in relying upon the advice of her attorneys and thus she was responsible for the ultimate loss resulting from the sale. (Code Civ. Proc., § 1911; 4 Witkin, Cal. Procedure (2d ed.) Judgments, § 198, p. 3336.)

The order of the trial judge sustaining the objections to the first account current could have been based upon the lack of notice of the sale (Prob. Code, §§ 770, 772), the failure to secure a 25 percent down payment, or the failure of appellant to obtain security for the balance due on the sale (Prob. Code, § 773). A determination that appellant was negligent in relying upon the advice of her attorneys was not essential to the trial court's judgment. Thus, the order sustaining objections to the first account current and tacitly refusing to confirm the sale to Cuilty does not preclude appellant from raising the issue of whether she is liable for the ultimate loss sustained by the estate as a result of the sale to Cuilty because she relied upon the advice of her counsel.

■ Appellant contends that there is no substantial evidence supporting the court's finding[5] that the losses to the estate in the sum of $117,-

---

[5] Since findings of fact and conclusions of law were waived by the parties, we do not have an express statement of the trial court's determination as to appellant's

841.76 were caused by appellant's negligence. We believe that the resolution of this issue is governed by our recent decision in *Estate of Guiol,* 28 Cal.App.3d 818, 824-825 [105 Cal.Rptr. 35], from which we quote at length: "[I]t is necessary to first recognize the primary duty of the administratrix, which was to 'take into [her] possession all the estate of the decedent, real and personal . . . .' (Prob. Code, § 571.) To assure that this protection is given the creditors and beneficiaries of the estate, there is a legal requirement that the administratrix file a bond to insure the integrity of administration ('. . . [the administratrix] shall faithfully execute the duties of the trust according to law'). (Prob. Code, § 541.) As complete exoneration of her failure to safeguard the estate's assets, Chandler claims reliance upon her attorney. As authority for her contention, she cites *Estate of Barbikas,* 171 Cal.App.2d 452 [341 P.2d 32]. That case is clearly distinguishable. In *Barbikas,* the attorney for one of the two executrices of the estate acted as escrow holder in the sale of a business possessed by the estate. During the course of the sale, the attorney was placed in possession of funds, which he embezzled. It was held that under such circumstances the respondents were not subject to surcharge for mismanagement of the estate. As was clearly observed in that case, the funds which came into the possession of the escrow holder were never received by the executrices. The court held that they acted ' "with that degree of prudence and diligence which a man of ordinary judgment would be expected to bestow upon his own affairs of a like nature." . . . Probate Code section 920 states substantially the same measure in providing that an executor or administrator "shall not . . . suffer loss by the decrease or destruction *without his fault,* of any part of the estate." ' (Pp. 457-458.) It is readily understandable that where normal business practices are pursued by the executrices, in the absence of negligence in the selection of the escrow holder there would follow no liability for the default of the escrow holder. This is in full conformity with the general rule of responsibility as discussed in the annotation in 28 A.L.R.3d 1191, at page 1198. In that same annotation (p. 1196), it states: 'Perhaps the clearest illustration of negligence on the part of an executor or administrator for which liability will be imposed is the surrender of the entire control of the estate to an attorney or an agent who later causes the estate to suffer a loss.' . . . In the instant case, the administratrix turned over possession and control of the money belonging to the estate to another person, her attorney. In doing so, she breached the duty of an estate representative. Even

negligence. However, in the absence of findings, we must imply in support of the judgment that all reasonable and necessary findings were made. (*Block* v. *Laboratory Procedures, Inc.,* 8 Cal.App.3d 1042 [87 Cal.Rptr. 778]; *Wise* v. *Clapper,* 257 Cal. App.2d 770 [65 Cal.Rptr. 231].)

though the selection of the attorney was without negligence, the surrender of all of the duties of the administration of the estate without the administratrix' becoming responsible to the distributees for any losses sustained would negate the purpose of bonding the estate representative to assure administrative integrity; were such to become the rule, both the estate representative *and* the attorney would have to be bonded to give adequate safeguard to distributees. ■ The applicable rule is set forth in *Gaver v. Early,* 191 Cal. 123, 127 [215 P. 394]: 'If a trustee confide the application of a trust fund to the care of another, whether a stranger or his own attorney or solicitor, or even cotrustee, he will be held personally responsible for any loss that may result. *Under such circumstances a trustee may employ attorneys or agents, according to the usual course of business, to reduce the estate to possession and protect it, but when once in his hands his personal duty to dispose and manage it begins, and this duty is not to be delegated.* [Citations.]' " (Italics added; fns. omitted.)

■ In the instant case, there was either a complete abdication of the administration of decedent's estate by appellant, or she knowingly acquiesced in the failure to comply with the Probate Code (§§ 770, 772, 773). We cannot say that the trial court erred in its implied finding that appellant was aware of the need to secure court approval for the sale of the practice to Cuilty.

It is urged that the evidence adduced at the hearings before Judge Koenig cannot be considered because that evidence was not before Judge Dowds. There is merit to this contention, and this would leave only appellant's bare statement of reliance upon her attorney as it related to the urgency of the sale. There was no evidence relative to her failure to obtain court approval thereof.

We have reviewed *all* of the records in an effort to reach the merits, to the fullest extent and find that appellant's contentions are without merit. With respect to the failure to secure court confirmation of the sale or to post notice and to open the sale up for bid, Evangelatos testified before Judge Koenig as follows:

"BY MR. HOBART: Is there anything by way of further clarification that you think would be necessary to show the state of mind between you and Mrs. Spirtos with respect to the necessity of the sale?

"<sub>o</sub> . . . . . . . . . . . . . . . .

"THE WITNESS: We had many conversations regarding the sale of the practice, and negotiations with Dr. Cuilty, and the question of confirmation came up during our conversations and—

"Q. By Mr. Hobart: Well, with respect to confirmation, since it was raised earlier, was there a purpose for not seeking—for, one, not filing or opening the bid, opening the sale up to publication in advance, and was there any reason for not filing for immediate confirmation at that time?

"A. The purpose was the time element, that was the entire purpose of not bringing this to the Court's attention. We felt that if we filed a petition, the landlord would find out about it and we would be evicted out of there and probably lose the sale completely if they were to find out that we were negotiating, if we had sold the practice.

"Secondly, Dr. Cuilty wanted possession immediately; he said if he gave his $25,000 he wanted to take possession right now, so we let him take possession the following Saturday. He says, 'I have to have some time to familiarize myself with the practice, because I am going to be evicted out of there no doubt, and I need every day I can get.'

"And, like I say, Mrs. Spirtos and I had several conversations regarding this; in fact, we even discussed with her father and her father's attorney about this problem.

"Q. Did Dr. Cuilty have any security or anything to your knowledge that you could take in order to protect the Estate any differently?

"A. No. We asked him for that. He had none. I asked Mrs. Spirtos if she would please check with her banker about this person and see what she could find. I did the same. I went to the Bank of America and checked on Dr. Cuilty, my banker checked on him and said that he had a good rating; he had borrowed money at the bank and he had paid it back and they felt that he was a good—he had already—he had paid back his loans; that is as much as we could find out, because he said he had no security, he had nothing to give."

The record thus clearly reflects the fact that appellant was apprised of the need to inform the court of the sale; yet, in spite of this knowledge, appellant chose to rely upon her attorney's practical opinion of urgency and to bypass petitioning the court.[6] Whether the record is devoid of any evidence purportedly excusing appellant from liability or whether the evidence taken before Judge Koenig is accepted on appeal the result is the

---

[6]Why confirmation under section 770 was not sought is not disclosed in the record. Perhaps it was the opinion that the property sold would not qualify within that section. We do not determine that issue.

same. Appellant, standing as a trustee with respect to the duty she owed to the estate, knowingly failed to execute the obligations she voluntarily assumed when she became the administratrix. Even though appellant may not have been negligent in the selection of her attorneys, it cannot be said that she was not negligent when she knowingly abdicated her duties to the estate.

Appellant further contends that even if this court affirms the surcharge, which we do, the amount of $117,841.76 is not a realistic amount of the actual damages caused by appellant's actions. In brief, appellant's argument is that at the time the medical practice was sold to Cuilty for $122,000, the only other outstanding offer was the bid of $37,500 by the lessor of the original premises. Had Cuilty's bid been rejected or disapproved by either the court (pursuant to Prob. Code, §§ 755, 770, or 773) or by appellant, the property would either have been sold to the lessor or would not have been sold at all. In either case, according to appellant, the amount which would have been realized would have been less than the amount actually realized by the estate as a result of the sale to Cuilty. In order to accept appellant's analysis, we would have to accept appellant's assertion that the value of the medical practice was less than $122,000, the sales price Cuilty agreed to pay. However, the only support for this contention is appellant's testimony relative to the lessor's offer of $37,500. The determination of the value of the medical practice was a material fact which we must assume was found by the trial court. (4 Witkin, Cal. Procedure (2d ed.) Trial, § 310, p. 3118.) In this case the court apparently set the value of the medical practice at the value established by the inventory and appraisement filed on May 5, 1967, which appraised the medical practice at its sale price. Certainly, where there has been a recent sale of the item to be valued, and no showing of collusion or unfair dealing to the detriment of either party, we cannot say that the price paid is not persuasive evidence of the true value of the item. Appellant's contention that the only alternatives to the sale to Cuilty were either to accept the offer of the lessor or not sell the property ignores one essential alternative: appellant could have attempted to sell the property to a different party; (that is one benefit of a return-to-court sale). Another alternative would have been to retain title to the property as per section 773. There is no evidence in the record before us to show that appellant exhausted reasonable alternatives prior to entering into the transaction with Cuilty. It may be true that it appeared to appellant, in all honesty, that she would lose the benefit of an excellent sale by complying with the requirements of the Probate Code. *This decision she made at her own risk.* The code requires the petition for approval of sale to be filed, and after the experienced judge, on a proper hearing, determines the propriety of the sale, the re-

sponsibility for the ultimate effect upon the estate is no longer on the shoulders of the administratrix. Nor can we say that on a proper petition the court would not have approved the sale to Cuilty, but until it did, the liability for loss was the administratrix'. Therefore, we cannot say that the sum of $122,000 is not a just representation of the value of the practice, or that appellant was not responsible for the loss to the estate occasioned by the financial instability of the person to whom the asset was sold without complying with the code.

With respect to the surcharges imposed by reason of the non prorata compromise of certain claims of the estate, we initially note that the administrator still retains the common law power to compromise claims. (*Estate of Coffey,* 161 Cal.App.2d 259 [326 P.2d 511].) However, creditors' claims of the same class must be prorated if there are insufficient sums to pay all creditors. (Prob. Code, § 952; *Newhall* v. *Newhall,* 227 Cal. App.2d 800, 817 [39 Cal.Rptr. 144].) ■ The Probate Code sets forth numerous substantive and procedural requirements without expressly stating that the administrator shall be liable for failure to comply with the terms of those sections, yet it is elementary that the administrator may be surcharged for failure to comply with the express requirements of the code where his failure results in the insolvency of the estate. (See *First National Bank* v. *Wakefield,* 148 Cal. 558 [83 P. 1076].) In the instant case, the amount of the surcharge imposed by reason of the loss occasioned by the unapproved sale of the medical practice to Cuilty and the unauthorized expenditures by the administratrix is more than enough to settle all the outstanding obligations of the estate. Thus, appellant need not have been surcharged for the amount represented by the uncompromised claims.

■ Appellant finally contends that the court erred in disallowing statutory commissions and fees to appellant. This contention is without merit. The actual ruling of the court was: "It is Further Ordered, Adjudged and Decreed that the petition of the said removed Administratrix for statutory and extraordinary Administratrix' and attorneys' fees be, and is hereby, denied without prejudice." The estate was not at that time in a position to be closed, and an apportionment of statutory commissions for estate services actually performed by the administratrix was not mandatory. We reach the same conclusion as to the contention that the administratrix' distributive share of the estate should be set off against any indebtedness owed by her to the estate. While this may be a proper means to satisfy that indebtedness, until the order for distribution is made there is no certainty as to the amount of that distributive share.

The motion to dismiss is denied; the judgment is affirmed except as to the surcharge to appellant for the amount of the uncompromised claims;

the cause is remanded with direction to correct the order of surcharge in accordance with this opinion. Each party to bear his or her own cost.

Ashby, J., and Hastings, J., concurred.