Carolyn CHRISTIE, Administratrix with Will Annexed of the Estate of Judson S. Berry, Deceased, Plaintiff and Appellant,

v.

Paul J. DOLD, Defendant,

and

Cyril D. Miller and Phyllis J. Miller, Defendants and Appellees.

Nos. 18608, 18627.

Supreme Court of South Dakota.

Considered on Briefs Sept. 14, 1994.

Decided Dec. 7, 1994.

Rehearing Denied Jan. 3, 1995.

Jerome B. Lammers and Ryker J. Lammers of Lammers, Lammers, Kleibacker & Parent, Madison, for appellant.

T.R. Pardy and Gregory A. Protsch of Mumford, Protsch & Pardy, Howard, for appellees.

RUSCH, Circuit Judge.

Carolyn Christie (Christie) is the administratrix with will annexed of the estate of Judson S. Berry. She was appointed to that position on July 7, 1992. Thereafter she filed this lawsuit against Cyril and Phyllis Miller (Millers), the former executors of the Berry estate, and against Paul J. Dold (Dold), an attorney. Dold represented Millers while they were the executors of the Berry estate. Christie's lawsuit was to recover money embezzled by Dold. It is undisputed that Millers had no part in or knowledge of the embezzlement. The suit against Millers is based upon their alleged negligence in employing and supervising Dold. Dold, who is presently an inmate of the State Penitentiary, allowed a default judgment to be taken against him in the amount of $331,886.35.[1]

Millers denied any liability and a trial was had to a jury, which returned a verdict for Millers. Christie appeals from that verdict and from the trial court's denial of her motions for a directed verdict and for judgment notwithstanding the verdict. Millers appeal from the trial court's decision that they were not entitled to a jury trial on the issue of negligence, the failure of the trial court to instruct the jury on contributory negligence,

---

1. This sum consists of $184,361.77 which Dold admitted embezzling from 1985 to 1992, $124,-147.42 interest on the embezzled funds, $7,000 which Dold failed to account for, $8,144.59 interest on the funds not accounted for, $3,767.16 repayment of attorney's fees, $4,281.64 interest on the attorney's fees and $164.77 costs.

and the refusal of the trial court to receive Exhibit D into evidence.[2]

## FACTS

Judson S. Berry (Berry), a resident of Howard, died on August 6, 1977. He left a will naming the Millers and Alvin Sukut (Sukut), all of Sioux Falls, as co-executors. Phyllis Miller is a cousin of Berry and Millers had acted as executors of Berry's parents' estate. Sukut is a personal friend of Berry. Dold, who was Berry's personal attorney since 1974, was hired as the attorney for the co-executors. There was no clear discussion with Dold about his employment, as the co-executors assumed that, since Dold had been Berry's attorney, he was entitled to act as their attorney in probating the estate.

At the time of his death, Berry owned real and personal property, which has no connection with this lawsuit, and a parcel of real estate located on West 41st Street in Sioux Falls which was leased to General Growth Properties. As to that property, the will provided for a trust as follows:

I hereby give, devise and bequeath that real property which I have leased to General Growth Properties, and the said lease thereon, to my good friend Alvin E. Sukut, of Sioux Falls, South Dakota, not for his own use and benefit, but in Trust upon the following terms and conditions:

1. The name of the Trust hereby created is to be known as "The Judson S. Berry Trust."

2. The Income from said Trust shall first be used to pay any of my remaining and lawful debts. Thereafter, I direct that my sister, Carolyn Christie, shall receive five hundred and 00/100 dollars ($500.00) of the monthly income from said Trust. If Carolyn Christie fails to survive me, or

upon her death, said $500.00 shall be distributed equally among her lawful issue and thereafter to their successive issue by right of representation.

The remaining income from said Trust shall accumulate until an additional $5000.00 is available for distribution over and above the $500.00 monthly income which Carolyn Christie is to receive. Said $5000.00 accumulation shall be distributed as follows:

(a) The Berry School of Mount Berry, Georgia, $1000.00;

(b) The Peace Lutheran Church of Sioux Falls, South Dakota, $500.00;

(c) The Golden Valley Lutheran College of Minneapolis, Minnesota $1000.00;

(d) The Bethany Lutheran Church of Howard, South Dakota, $500.00;

(e) My friend, Alvin E. Sukut, of Sioux Falls, South Dakota, $1000.00; and

(f) My sister, Suzanne Flanigan, $1000.00.

Sukut began serving as a co-executor but resigned after it appeared that he improperly disposed of some of the estate assets. From that time on, Millers served as the only co-executors. The probate process was lengthy.[3]

From 1977 to 1983, Millers and Dold were in frequent contact. Millers sent Dold at least thirty letters and notes prodding him to take action to complete various parts of the probate. After 1983 there were no further contacts between Millers and Dold.

On November 2, 1983, Millers signed a Final Accounting and Petition for Distribution of the Berry Estate which was prepared by Dold. This petition requested that the 41st Street real estate and the General

---

2. Exhibit D is a photocopy of the purported certified copy of the order establishing the Berry Trust and appointing Dold as trustee. Dold testified that this order was signed by Judge Hurd on November 30, 1983 and filed with the clerk of courts on that date, but the original can not be found. The certified copy which was the source of the photocopy can not be found either.

3. There were delays due to Sukut's actions in disposing of some of the estate assets without authority. In addition there was litigation concerning other property belonging to the estate. That prior litigation has no bearing on the present case.

Growth Properties' lease and all other property of the estate be transferred to the Judson S. Berry Trust and that Millers be discharged from any further duties and liability for the estate. On November 14, 1983, Lynn Kalvig, Clerk of Courts of Miner County, signed a notice of hearing which gave notice that a hearing on the petition for distribution would be held in Howard on December 6, 1983, at 10:00 a.m. before Judge Thomas Anderst. On November 21, 1983, Donna Koop, Dold's secretary, signed an affidavit of mailing stating that on that date she mailed copies of the accounting and petition and of the notice of hearing to all interested parties, including Christie and Millers. Both Christie and Millers admitted receiving notice of the hearing but neither of them appeared at the hearing.

Dold testified that at this hearing on December 6, 1983, Judge Anderst authorized the closing of the estate, the distribution of the assets of the estate to the trust, and the discharge of Millers as co-executors. However, the court records of Miner County do not contain any written order from the court closing the estate, distributing the assets, or discharging the Millers. Dold claimed that after the hearing, he prepared and mailed an order to Judge Anderst to close the estate and discharge the Millers. Dold testified that he assumed that the order was signed and filed, that he never checked or had any reason to check whether the order was filed, and that he could provide no explanation as to what had happened to the original order.

Also on November 2, 1983, Millers signed a petition for Judicial Supervision of Trust and Construction Thereof and Appointment of a Trustee of the Judson S. Berry Trust which was also prepared by Dold. This petition requested that the Minnehaha County Circuit Court assume supervision of the trust and that Dold be appointed as trustee of the Berry Trust.[4] On November 16, 1983, Circuit Judge Richard Hurd, signed a notice of hearing which gave notice that a hearing on the petition for judicial supervision would be held in Sioux Falls on November 30, 1983, at 1:30 p.m. before Judge Hurd. On November 16, 1983, Dold's secretary signed an affidavit of mailing stating that on that date she mailed copies of the notice of hearing to all of the interested parties. Christie and Millers admitted receiving notice of that hearing but, again, neither of them appeared.

Dold also testified that at this hearing on November 30, 1983, Judge Hurd authorized the establishment of the trust and appointed him as trustee. Absent from the court records in Minnehaha County is any order creating the trust and naming Dold as its trustee. However, Dold testified that after the hearing, Judge Hurd signed an order creating the trust and naming him as trustee and that he then filed the signed order with the Clerk of Courts of Minnehaha County. Dold further testified that he obtained a certified copy of that order at the same time that he filed it. A photocopy of the certified copy of the order establishing the trust was located but the certified copy of the order can not be found. The photocopy of the certified copy was offered at trial as Exhibit D but was refused by the trial court. The Clerk of Courts of Minnehaha County testified that they can not locate the original of that order and that there are certain aspects of the photocopy of the certified copy which differ from normal certified copies issued by their office.

Following this hearing Dold opened a bank account at the Security State Bank of Canova in the name "Judson S. Berry Trust, Paul J. Dold, Trustee, P.O. Box 336, Howard, SD 57349." He also obtained checks bearing that name and address.

As pointed out above, the land which was the subject of the trust was encumbered by a long-term lease to General Growth Proper-

---

4. This trust was allegedly established in Minnehaha County because that was the locus of most of the trust property. The Berry will named Sukut as the trustee but he resigned as trustee in connection with his prior difficulties with the estate. The will named Roger Haugo of Sioux Falls as alternate trustee but he declined to act. With no named trustee that left it up to the courts to select a successor trustee. See SDCL 55–3–21.

ties. The rent paid by General Growth began in 1977 at $1,000 per month. The lease also contained provisions by which the amount of the rent would increase over time. By November of 1993, the rent had increased to $2,517 per month.

For several years after Berry's death, the rent payments went to pay off a mortgage which he had placed on the 41st Street property with the National Bank of South Dakota, which later became the First Bank of South Dakota. That mortgage was paid off in 1983. After the loan was paid off, General Growth continued to send its rent payments to First Bank of South Dakota which then sent Dold a cashier's check made payable to the Judson Berry Estate. Dold deposited some of the rent checks into the Canova account. Others were deposited directly into Dold's accounts. In addition, Dold wrote checks on the Canova account payable to himself and also transferred money from the Canova account to himself using other accounts. Dold admitted embezzling approximately $186,000 from this "trust" account from 1985 to 1992. There is no evidence that Dold took any money prior to December 6, 1983, when the estate was supposedly terminated and the trust established.

Dold wrote monthly checks to Christie in the amount of $500 drawn on the Canova account. These checks were written on the check blanks which indicated that they came from the Berry Trust account and that Dold was the trustee. No payments were made to any of the other beneficiaries of the trust.

Millers, who were not beneficiaries of the trust, testified that Dold told them at the time they signed the petition for final distribution of the Berry Estate, that after the hearing on December 6, 1983, they would no longer be executors of Berry's estate since the estate would be concluded and the trust established.

Christie, who is a beneficiary of the trust, wrote Dold asking for an accounting of the estate on September 8, 1981, but did not receive one from him. She also asked for an accounting some time in 1985 or 1986 and periodically after that, but none was ever forthcoming. In 1989, a trust account check made payable to Christie bounced but Dold made it good. When more checks bounced in 1991, Christie complained to the State Bar of South Dakota. The Bar conducted an investigation which revealed the embezzlement scheme. Their findings were turned over to the Attorney General and subsequently Dold pled guilty to two counts of embezzlement and was sentenced to eight years in the State Penitentiary.

Christie disputes that either the Miner County or Minnehaha County hearings ever took place, that either judge signed such orders, and that either order was filed with the clerk of courts of the respective counties. Christie also contends that a trust was never established and that the Millers were never released as co-executors in 1983 so they were personally liable for Dold's embezzlements which took place from 1985 to 1991.

At trial, the court furnished the jury with special verdict forms. The court asked the jury to determine whether a trust had been created and whether the assets were transferred out of the estate and into the trust. The jury was instructed that if they found a trust had been created and that the assets were transferred out of the estate and into the trust, they were to find in favor of Millers.

By means of these special verdict forms, the jury found that a trust was created in 1983 and that the estate assets were transferred out of the estate and into the trust. With the jury findings on those facts, judgment was entered for the Millers since their duties as co-executors were finished once the trust was created and the assets transferred out of the estate.

## DECISION

### I.

An attorney who is employed to probate an estate is not employed by and does not represent the estate. Rather, the

personal representative (administrator or executor) is the client and the attorney represents them as their counsel. The selection of an attorney by the decedent is not binding upon the personal representative because, if the attorney is derelict in his duties, the personal representative is liable and so he must have the power to select his or her own attorney. The fact that the attorney represents the personal representative and not the estate has been settled in South Dakota since *In re Sachs' Estate*, 68 S.D. 18, 297 N.W. 793 (1941). In *Matter of Estate of Schuldt*, 457 N.W.2d 837 (S.D.1990) this Court pointed out that attorney's fees are a matter of contract between the personal representative and the attorney, but that the personal representative is entitled to reimbursement for the legal fees that he incurred in carrying out his trust as personal representative. *See also State v. Smith*, 260 Minn. 405, 110 N.W.2d 159 (1961); *In re Estate of Ainsworth*, 52 Wis.2d 152, 187 N.W.2d 828 (1971); *Shannon v. Superior Court*, 217 Cal.App.3d 986, 266 Cal.Rptr. 242 (1990).

## II.

■■■ A personal representative is obligated to carry out many duties during the probate of an estate. Generally speaking, he must qualify as personal representative, inventory the assets, collect the assets, manage the assets while in his possession, allow and pay claims, and distribute the remainder of the estate. A personal representative acts in a fiduciary capacity on behalf of all parties who have interests in the estate including heirs and creditors. *Matter of Estate of Pina*, 443 N.W.2d 627 (S.D.1989). A personal representative is obligated to use the same care and skill in managing an estate that a reasonably prudent man would utilize in the management of his own affairs. Howard J. Alperin, Annotation, *Liability of Executor or Administrator, or His Bond, for Loss Caused to Estate by Act or Default of His Agent or Attorney*, 28 A.L.R.3d 1191, § 2(a) (1969); 31 Am.Jur.2d *Executors and Administrators* § 529 (1989). A personal representative may be personally liable for losses

caused by the actions of his attorney if he does not use due care in managing the estate. However, a personal representative is not strictly or vicariously liable for the actions of his attorney or agent. *Hill v. Evans*, 114 Mo.App. 715, 91 S.W. 1022 (1905); *In Re Chandler's Estate*, 136 Or. 128, 297 P. 841 (1931); *Kaufman v. Kaufman's Adm'r*, 292 Ky. 351, 166 S.W.2d 860 (1942); *Laramore v. Laramore*, 64 So.2d 662 (Fla.1953); *Murdock v. Murdock*, 370 So.2d 290 (Ala.1979).

> Although an executor who is a layman has the right to rely upon the advice and counsel of an attorney unless the situation is one where common prudence would require a layman to do otherwise, if due care is exercised in the selection and employment of an attorney or agent, the executor is not absolutely bound by the dereliction of the attorney or agent. A representative may not surrender all the duties of his trust or delegate all his functions to the attorney without becoming responsible to the distributees for losses caused by the attorney's conduct. And estate losses due to misconduct of an agent are chargeable to the personal representative where he has failed to give the attention to the activities of the agent that a reasonable person would have given under similar circumstances.

31 Am.Jur.2d *Executors and Administrators*, §§ 448, 449 (1989). A personal representative is liable for the actions of his attorney if he is negligent in selecting the attorney to handle a probate. *In re Barbikas' Estate*, 171 Cal.App.2d 452, 341 P.2d 32 (1959); *Kaufman v. Kaufman's Adm'r, supra.* A personal representative is also liable if he fails to exercise control over the attorney or fails to supervise the attorney. If a personal representative surrenders complete control over an estate to his attorney, this is negligence, as no reasonably prudent person would do that for his own affairs. *Laramore, supra; Kaufman, supra; Succession of Hess*, 205 So.2d 74 (La.App.1967).

■■■ However, a personal representative may justifiably rely upon the advice of an attorney. *In Re Barbikas' Estate*, 341 P.2d

at 37; *In Re Estate of Spirtos,* 34 Cal.App.3d 479, 109 Cal.Rptr. 919 (1973); *Murdock v. Murdock,* 370 So.2d at 292. In somewhat different circumstances, this Court has recognized the right of a personal representative to rely upon the advice of an attorney.

> However, the court found the inexcusable neglect of the estate attorney should not be imputed to the executrix: she was persistent and consistent in her expressions to the estate attorney of dissatisfaction over the sale price of the real estate; throughout the course of the estate proceedings, she sought and followed the advice of her attorney; she had a right to place her faith in him and had a right to be dubious; upon the entry of the Order Confirming Sale, she acted promptly to set aside the confirmation. Thus, under the circumstances, she acted as a prudent person would be expected to act.

*Gold Pan Partners, Inc. v. Madsen,* 469 N.W.2d 387, 391 (S.D.1991).

In determining whether Millers supervised Dold in the manner which a reasonably prudent person would in regard to his own affairs, it is necessary to look at the period from 1977 to 1983 and the period from 1983 to 1992 separately.

From 1977 to 1983, Millers exercised control over and supervised the estate. They reviewed the bills and signed the checks. They wrote Dold letters indicating they were aware of what was being done. The letters also indicate they were aware of what Dold had not done and were reminding him of the things that needed to be done. From 1977 to 1983, Millers exercised control over Dold and supervised him. They did not surrender control over the estate to him in a manner that would constitute negligence on their part.

From 1983 to 1992, Millers surrendered complete control over the estate to Dold. However, Millers did this because they believed that the estate had been terminated and the trust had been established.[5] Millers acted reasonably in believing that their duties as co-executors were completed. No reasonably prudent person would personally go to the courthouse and review the estate file to see whether the probate had been concluded when they had signed the appropriate papers and their attorney told them that they would be discharged after a certain date. Even Christie believed that the probate had been terminated and the trust had been established after 1983.

The letter sent to Judge Tucker by Millers on June 29, 1992, supports this view. In the letter, Millers state that they finished their portion of the will when Dold was named conservator (actually trustee) and they had no dealing with the will since then.

Under the circumstances, Millers acted as a reasonably prudent person could be expected to act. Millers cannot be faulted for surrendering control over the estate assets to Dold in 1983 when they reasonably believed that he had been appointed as trustee of the Judson Berry Trust and that the assets had been distributed to the trust.

Christie's motion for a directed verdict and for judgment notwithstanding the verdict were properly denied by the trial court.

### III.

The jury in this case never reached the issue of whether Millers were negligent in supervising Dold because the jury determined that the money was embezzled from the Berry Trust, for which Millers had no

---

5. In 1983 Dold prepared and had Millers sign, a final accounting and petition for discharge as co-executors of the estate. They received notice of the hearing on that petition. Dold told them that they would be discharged when that hearing was held on December 6, 1983. Similarly, Dold prepared and Millers signed a petition to establish the trust. They also received notice of the hearing on that petition and Dold told them that the trust would be established following the hearing on November 30, 1983.

responsibility, and not from the estate.[6]

Christie contends that there was no evidence from which the jury could find that a trust had been created or that any assets were transferred to the trust. Christie relies upon the fact that the original order creating the trust and naming Dold as trustee has never been found. The only evidence that the order was signed by Judge Hurd and filed with the clerk of courts was the testimony of Dold that these actions were taken. If believed, Dold's testimony would establish all of the legal requirements for the creation of a trust as set out in the trial court's instructions.[7]

 Christie argues that an order can only be effective if it is signed by the court and filed with the clerk of courts. SDCL 15-6-58; *Union Savings Ass'n v. Somers*, 40 S.D. 177, 166 N.W. 638 (1918); *Mushitz v. First Bank of South Dakota*, 457 N.W.2d 849, 857 (S.D.1990). These authorities require that an order must be signed by the judge and filed with the clerk of courts in order to be effective. However, these cases do not indicate that the only way to prove the existence of an effective order is to retrieve it from the clerk of court's office. The actual signed order would be the best way to prove the existence of a court order. This does not preclude the fact that secondary evidence may be used to establish the existence of official records which can not be produced. 29A Am.Jur.2d *Evidence* § 1072 (1994).

Where the issue is raised, as it is in this case, as to whether the document ever existed, it is for the jury to determine whether it existed. SDCL 19-18-8.

 In this case Dold testified that the order was signed by the judge and filed with the clerk of courts. The clerk of courts established that the order could not be found. However, a deputy clerk of courts in Minnehaha County indicated that it was possible the order was mistakenly returned or misfiled.

Christie's claim that there was no evidence to support the jury's finding that the order did exist is based upon her argument that this court should ignore the testimony of Dold because he is a convicted felon. However, Christie points to no authority that a jury may not believe a convicted felon. In addition, it is not the duty of an appellate court, in reviewing a verdict, to weigh conflicting evidence or pass upon the credibility of witnesses. *Lukens v. Zavadil*, 281 N.W.2d 78, 80 (S.D.1979); *Sharkey v. Washington Nat. Ins. Co.*, 373 N.W.2d 421, 427 (S.D.1985); *Treib v. Kern*, 513 N.W.2d 908, 911 (S.D.1994).

The jury was aware of Dold's convictions for embezzlement from two estates. They were instructed that the credibility of a witness may be attacked by evidence that the witness was convicted of a crime. They were also instructed that if they believed anyone

6. The jury, by means of special verdict forms, found that there was a trust and that the estate assets had been transferred to that trust.

7. The jury was given the following instruction to determine whether a trust was created:
 A trust is not legally created unless there is an Order entered by a court of competent jurisdiction establishing the trust and naming a trustee. •
 If you find that a trust was created in this case and that the assets of the estate were transferred to the trust, then Defendants were not liable for those assets so transferred after their transfer.
 If you find that a trust was not created or the assets were not transferred from the estate to the trust, then the property remained the property of the estate. Whether these defendants

were negligent in their duties as executors of that estate is for your determination. (Instruction # 20)
We express no opinion as to whether the portion of the instruction indicating that a trust is not legally created unless there is an order establishing the trust and naming a trustee is a correct statement of the law. There are numerous methods of creating a trust other than a court order. Fratcher, *Scott on Trusts* (4th Ed.) § 17 points out that trusts can be created by inter vivos conveyances, declarations of trust, transfers by will, and powers of appointment. In addition there is the entire area of constructive trusts. *Bogert on Trusts* (2nd ed. rev.) § 471. However, Christie did not object to this instruction nor propose any instructions of her own concerning the creation of a trust.

was testifying falsely as to a material matter, they could disregard that person's entire testimony. The jury was adequately aware of Dold's shortcomings and chose to believe his testimony anyway.

 In reviewing a jury verdict, the appellate court presumes that the trial court's rulings were correct and will not seek reasons to reverse. The appellate court views the evidence in the light most favorable to support the jury verdict. *Treib v. Kern, supra* 513 N.W.2d at 911. It is not the function of the appellate court to weigh the evidence and substitute its judgment for that of the jury. *Robinson v. Mudlin*, 273 N.W.2d 753, 755 (S.D.1979); *Westover v. East River Elec. Power*, 488 N.W.2d 892, 896 (S.D.1992).

If there is any substantial evidence to allow reasonable minds to differ, the verdict will not be disturbed even though evidence exists that would warrant a different conclusion. *Rumbolz v. Wipf*, 82 S.D. 327, 145 N.W.2d 520, 522–23 (1966); *Treib v. Kern*, 513 N.W.2d at 911.

In this case there was the testimony of Paul Dold that the order was signed and filed. Based upon this evidence the jury could find that a trust was created by the entry of an order by a court of competent jurisdiction and that order was filed with the clerk of courts.

There was also substantial evidence that the estate assets were transferred to the trust. Christie received checks drawn on the trust account for nearly ten years. Obviously assets were transferred to the trust in order to make that possible. There is clearly enough evidence in this case for the jury to have reached the verdict which they did.

In light of this decision, we do not reach the other issues raised by Christie or the issues raised by Millers in their notice of review.

The judgment is affirmed.

SABERS and AMUNDSON, JJ., and VON WALD and TRANDAHL, Circuit Judges, concur.

RUSCH, Circuit Judge, for MILLER, C.J., disqualified.

VON WALD, Circuit Judge, for WUEST, J., disqualified.

TRANDAHL, Circuit Judge, for KONENKAMP, J., disqualified.