HAGIN, Respondent v. DeGEEST d/b/a HAND COUNTY
CLINIC, Appellant

(185 N.W.2d 478)

(File No. 10827.   Opinion filed March 24, 1971)

Rehearing denied April 13, 1971

**Heidepriem, Widmayer & Zeigler,** Miller, for defendant and appellant.

**Davenport, Evans, Hurwitz & Smith, Robert C. Heege,** Sioux Falls, for plaintiff and respondent.

WINANS, Judge.

The plaintiff, John C. Hagin, a medical doctor, entered into an employment agreement with the Hand County Clinic, a partnership consisting of the defendant, J. H. DeGeest, and also Thomas K. Hines, both medical doctors practicing in Miller, South Dakota. The agreement dated February 18, 1965 provided for the employment of the plaintiff by the clinic in the practice of medicine for a period of six years commencing March 1, 1965. Defendant, DeGeest, became the owner and successor in interest of the Hand County Clinic in January 1967.

The complaint seeks a determination and construction of the employment contract and of the rights of the plaintiff and alleges generally that he has performed his undertakings and that defendant refused to perform his. Defendant, the employer, by his amended answer admitted the written employment agreement between the parties, but denies performance of the plaintiff and alleged as affirmative defenses:

1. Abandonment of the contract referred to above, in June of 1967.

2. New oral agreement in June 1967 superseded and released the written agreement.

3. Modification of the contract by the parties, and

4. Breach of the contract by plaintiff.

The action was tried to the court and the court entered its findings of fact and conclusions of law and judgment in favor of the plaintiff employee and against the defendant employer for the sum of $11,625, being the amount stipulated to be unpaid under the written agreement if plaintiff's position was sustained.

The written contract, subject of the suit, provided for payment of $12,000 per year ($1,000 per month) for two years, then $8,000 per years ($666.66 per month) for the third and fourth years, and $6,000 per year ($500 per month) for the fifth and sixth years. For a better understanding of the controversy, it is necessary to set forth paragraphs 4, 5, 6 and 7 of the written agreement, which are:

"(4) Second party shall be entitled to receive 60 days vacation each year during the term of employment and in addition shall be entitled to a one day vacation each week during the normal working week, which consists of the days Monday through Saturday of each week. Second party shall also have such additional time off as he may deem necessary for his health. It is agreed that second party shall not be obligated to answer night calls or house calls.

(5) It is agreed by the parties that in the event of the death of second party during the term of this employment agreement, then first party shall make payment of the salary, as hereinafter recited, to the wife of second party, namely, Hester Hagin, as follows:

In the event said death occurs at any time during the first two years of the term of employment, then such payment for a period of 12 months at the rate as set forth in the payment schedule above, the same as if the term of employment had continued for an additional 12 months from the date of death;

In the event said death occurs during the third year of the term of employment, then such payments shall be made for a period of 36 months at the rate as set forth in the payment schedule above, the same as if the term of employment had continued for an additional 36 months from the date of death; and

In the event of the death of second party at any time after the third year of the term of employment, then the payments shall be the same as if the entire term of employment had been fulfilled by second party.

(6) It is further agreed by the parties that in the event second party shall become totally disabled during the term of employment then and in that event, first party shall nevertheless continue to make the payment of the salary to second party from the onset of said disability for a period as follows:

In the event that such disability occurs during the first two years of the term of employment, then such payment for a period of 12 months at the rate as set forth in the payment schedule above, the same as if the term of employment had continued for said 12 months from the onset of said disability;

In the event said disability occurs during the term of the third year of the term of employment, then such payment shall be made for a period of 36 months at the rate as set forth in the payment schedule above, the same as if the term of employment had continued for said 36 months from the onset of said disability; and

In the event of the disability of second party at any time after the third year of the term of employment, then the payments shall be the same as if the entire term of employment had been fulfilled by second party.

(7) Second party shall have the option to terminate this employment agreement at any time, in the event second party shall decide to retire entirely from the active practice of medicine, this agreement shall be terminated."

It appears from the evidence that defendant and plaintiff had practiced medicine together for some years prior to the written contract and that for a time at least during the period covered by the agreement things had gone along smoothly enough. After the execution of the agreement, the first conversation concerning the employment agreement, according to defendant, was had about the middle of June 1967. The defendant with reference to this conversation testified as follows:

"Q  All right.  Now, did you at anytime, have a conversation with Dr. Hagin about your relationship in or about the middle of late June of 1967?

A  Yes.

Q  Who was present at that conversation?

A  Doctor Hagin and myself.

Q  And where was it held?

A  Held in the consultation room of the Hand County Clinic, which is near the rear end by the X-Ray room.

Q  And can you tell us as nearly as you can remember, what he said and what you said?

A  Yes.  As time went on I continued to be alone and unassisted.  I finally felt that there was a time I needed to talk to Dr. Hagin to find out what his plans were and ask him if he would confer with me in the consultation room.  He was happy to do so and it was a friendly meeting.  It went something like this; I asked him if he had retired or was planning to retire completely from the practice of medicine, he guessed he was.  I asked him if he considered himself totally disabled.  He said he was not, and prior to this I had read the contract a time or

two so I said this makes a big difference in the contract, do you know this? He said he did know this. There wasn't much more said, and on the basis of this I concluded that he was retiring from the practice of medicine. This meant this contract was then no longer in existence and advised the office girl that he would not be expecting a check at the end of June.

Q All right, then what happened with respect to his paycheck at the end of June?

A Well Doctor Hagin apparently did not see it the same way I saw it, because at the end of the month he came expecting his check and the office girl said that I had said there was no—that he was not expecting a check, and this was not the case; and he then requested consultation with me and we retired to the same room and did confer. I expressed my view that if he was retiring from the practice of medicine and not disabled, not totally disabled, I felt the contract was over. I didn't feel that I was going to continue to pay if he did not work. I might elaborate to say that during the months of May and June I was feeling somewhat bedraggled at the time, of several months of solo practice, and it seems to me Doctor Hagin was much more energetic than I. He was bouncing up and down the hall, having coffee with the girls, and did not have the appearance at all of someone who is being forced into retiring. If he was retiring it was by choice in any case. He then said to me something to the effect that I didn't believe in contracts and that I wasn't keeping my word and I probably denied this. I don't remember the words in any case. I pointed out that I felt if he wanted to be paid he should work, and in fact the first day after the first of July, which was the first working day, I think it was July 5th, he did come to work and he did work continuously until the end of October, and again with what I considered to be considerable vigor. He did

surgery, nine operations in the seven weeks prior to his departure the end of October. Two of them unassisted, the remainder with one or more assistants, and one of which was a cystectomy, removal of the gallbladder. He stated prior to the operation that he wanted me to take over if he felt that he didn't want to continue. I agreed to this but it was not required. He continued and completed it. As a matter of fact, on the 30th of October, two days prior to his departure, he did a bilaterial hernia repair."

Dr. DeGeest described another conversation had with Dr. Hagin in December of 1967:

"Q  All right, did you have another conversation with Dr. Hagin about his pay and the contract?

A  Yes.

Q  When was that?

A  Sometime in December and I can't tell you the date, but maybe around the 10th. He called from Phoenix and asked about his November check, and I remember it irritated me. My previous words were that I felt that contract was over and the months that he worked he would be paid, and that he had not worked in November so there wasn't a check in the beginning of December, and he was disappointed in me I am sure and felt that I again was not honoring the contract, but I disagreed with him on this point."

Doctor Hagin testified in general terms that from January 19, 1967 he lived some period of time in Arizona for health reasons. He was suffering from emphysema, that he had to find a dry climate because he could not take the cold and snow. He returned to Miller, South Dakota, in May of 1967 and went back into the Hand County Clinic with Doctor DeGeest and resumed the practice at that time. Then in November of 1967 he returned to Arizona again on account of his health, which he described as bad, and stayed in Ari-

zona until about the first of May 1968 and upon his return again took up his work at the Hand County Clinic, leaving for Arizona about the first of December and returning to Miller, South Dakota, around May 1, 1969, where he worked at the Clinic until the 15th of November 1969. During this latter period his health had been deteriorating rather rapidly. Doctor Hagin testified that during this period of time when he was in Arizona he did not practice medicine. He was there for health reasons, it being a dry and warmer climate. He had maintained his residence in Miller ever since 1925, where he had lived in his present home since 1950. He also purchased a home in Arizona in January 1967.

Dr. Hagin, on November 5, 1969 sent by registered mail a letter to Dr. DeGeest, which the doctor admits receiving, in which he stated he was "physically totally disabled and unable to continue the practice of medicine and surgery" and "I am, therefore, compelled to invoke my condition of permanent total disability under the terms of my contract with you in the Hand County Clinic." In his letter he set the time of his termination of work as November 15, 1969.

It is shown by an exhibit stipulated to and introduced into evidence that Dr. Hagin was paid in full according to the terms of the agreement for the first two years being at the rate of $1,000 per month, the exhibit then shows a further payment of $1,000 made 3-31-1967, and monthly payments commencing April 29, 1967 at the rate of $750 a month to and including October 31st. During the year 1968 payments were made at the rate of $750 monthly, commencing May 31st and continuing to December 2nd, for a total of seven payments, and in the year 1969 Dr. Hagin was paid at the same rate commencing May 31st and continuing to October 30th for a total of six payments and a further payment of $375 received by Dr. Hagin from Dr. DeGeest.

The plaintiff has appealed from the judgment of the court herein and as a basis for his appeal presents a number of assignments of error. His first assignment is that the trial court failed to admit into evidence a number of exhibits. His second assignment of error urges that the trial court erred in ordering present payment of future installments under

the written agreement. The other claimed errors being numbered 3, 4 and 5 in his assignment, will be discussed together hereinafter for the reason that they take up somewhat similar matters. It is the claim of the defendant that the contract agreement was altered or amended or modified or replaced by a new contract and that plaintiff is estopped to deny the existence thereof. Further that the plaintiff breached the contract and further that by his statements and conduct plaintiff terminated the contract by retirement.

Part I. Exhibits T-14 to T-18 inclusive and T-20 were offered in evidence by defendant, and the trial court in each instance stated he would reserve his ruling on these exhibits. In a broad sense these exhibits were offered to show that Dr. Hagin had become a life member in the South Dakota State Medical Association and in support of defendant's theory that Dr. Hagin had retired. It appears from these exhibits to become a life member of the association certain requirements were made each of which had to be met by the applicant, in this case Dr. Hagin. One of these (number 2) states "are not engaged in the active practice of medicine", and then one of the following requirements:

1. Are over age 65.

2. Are incapacitated for work because of illness or infirmity. Some time in June of 1967 Dr. Hagin became a life member of the South Dakota Medical Association by action of its House of Delegates. Dr. Hagin had instituted this action by his application to obtain such a status. This action on the part of the Medical Association is reflected in the exhibits on which the court reserved its ruling.

Considering the exhibits and giving to them every possible implication, still it stands undisputed in the record that during all of the time covered by the employment agreement to the date of trial Dr. Hagin was a member in good standing of the Medical Association; that his license had never been revoked or canceled, and that he continued in the actual practice after the date he was awarded life membership until November 15, 1969, which was the date he wrote Dr. DeGeest that he was retired and claimed his privilege to be paid under the terms of the agreement. Further, during all of this time

Dr. DeGeest had been making payments to Dr. Hagin for services rendered, which payments have been referred to above. The lower court was entitled to weigh all these factors, and must have, and would be entitled to conclude that Dr. Hagin did not in fact decide to "retire entirely" from the active practice of medicine as such option was referred to and open to him under the provisions of paragraph number 7 of the employment agreement. It is also undisputed that at the time of the trial in December of 1969, Dr. Hagin was of the age of 75 years. In addition the employment agreement also contained the following under number 4 "Second party (this would be Dr. Hagin) shall also have such additional time off as he may deem necessary for his health". The evidence establishes that Dr. Hagin's health was a matter of concern to him and known to the other parties of the agreement at the very inception of the employment agreement and that the terms of the contract concerning health and retirement entirely due to disability were very liberal to Dr. Hagin.

In the case of Chapman v. Greene et al., 27 S.D. 178, 130 N.W. 30, where the court had ruled out competent evidence and there was a close question whether the findings were sustained by the evidence considered, it was held on appeal "it must however be conclusively presumed that the trial court did not, in making its findings, consider any evidence which it had ruled out" and reversed the lower court saying "This evidence should not have been stricken and if considered by the trial court might well have resulted in different findings and therefore in a different judgment."

The case of Thurber v. Miller et al., 14 S.D. 352, 85 N.W. 600, in which the lower court reserved its ruling on an objection made to the introduction of certain evidence, holds the true rule to be expressed in the case of Sharp v. Lumley, 34 Cal. 611, 614, quoting from said case with approval, "We here take occasion to remark that, whenever a district judge receives evidence in the course of a trial, and reserves the question of its admissibility for further consideration, when his conclusion is attained he should expressly and distinctly rule upon it one way or the other, so that the party against whom the ruling is made can have the benefit of a specific

objection. We often find in records evidence received in this manner, subject to be finally received or rejected after more mature consideration, without any clue to the final ruling other than such as may be inferred from the general result. It may also be added that questions should not be so reserved without the consent of parties in cases where the consequences of the ruling might be obviated by other evidence on the part of the party against whom the ruling is finally made".

While not especially germane to the problem presented here, our court has said "Where an action is tried to the court the presumption is that testimony improperly admitted is disregarded." Sulzbach et al. v. Town of Jefferson, 83 S.D. 156, 155 N.W.2d 921. See 2 Dakota Digest, Appeal & Error 931 et seq.

■ Also it appears that the trial judge did give consideration in his evaluation of the case to the exhibits which he took under advisement. The judge, after the parties had rested, made his decision from the bench and among his remarks at that time stated "What the doctors try and do to the Medical Association is a thing between their consciences and the Executive Secretary of the Medical Association. I don't think payment made by Doctor DeGeest after the alleged retirement according to the Medical Association records, is material in this case, * * *." We find no prejudicial error on account of the court's action on the exhibits.

Part II. The defendant next objects to the judgment of the court because it included installment payments which were due at a future date. The employment agreement provisions of paragraph numbered 6 provides for disability payments. Dr. Hagin terminated employment because of his disability as of November 15, 1969, which would be "after the third year of the term of employment" and he would therefore be entitled to payments "the same as if the entire term of employment had been fulfilled by second party". The schedule of payments provided for a yearly sum payable each year in twelve equal monthly payments and payable on the "first day of each month during the term of the employment."

■ Plaintiff's position is that he is entitled to anticipate the breach and not required to await due dates or bring successive actions for each future installment. Minnesota Amusement Company v. Larkin, 1962, 8 Cir., 299 F.2d 142, at page 152. Defendant did not contest Dr. Hagin's claim that he was "physically totally disabled". The evidence at the trial amply supported he was. Dr. Hagin said that to continue the active practice of medicine in his opinion would be fatal to him. Dr. Morrissey testified in his opinon Dr. Hagin was totally disabled for the practice of medicine and surgery and that his condition was irreversible. The rule pertaining to contracts to perform personal acts appears to be "reasonable apprehension on the part of the promisor that performance would seriously jeopardize his life or health, or that of others, excuses him from performance, unless an intention to the contrary has been manifested or he is guilty of contributing fault." 17A C.J.S. Contracts § 465, at page 626.

In the case of Hollwedel v. Duffy-Mott Company, Inc., 1933, 263 N.Y. 95, 188 N.E. 266, 90 A.L.R. 1312, the court holds in an action by employee to recover damages for the breach of a contract of employment for ten years by the discharge of the employee shortly after the end of the second year that the damages might be measured prima facie by the unpaid wage but that it was the present worth of the obligation to pay the wages at a time in the future that fixed the damages. In the annotation to the above case a number of cases giving the "present worth" theory are cited. See also 22 Am.Jur.2d, Damages, § 26.

■ The court in the present case did not attempt to arrive at present worth, but allowed the whole amount provided for by the agreement which included 14 installments due in the future. We hold that as to these installments there should have been a reduction to "present worth" so that the sum as so computed should have been the aggregate of such sums which with interest at the legal rate of 6% would produce at their respective due date the several installments due under the agreement.

Part III. Lastly we consider the assignments of error in which the defendant makes claim that the plaintiff breach-

ed the employment agreement, that it was altered or amended or modified or replaced by a new oral contract, and plaintiff estopped to deny the existence thereof.

■ All of these points, singly or in combination, have been found against the defendant by the decision and judgment of the lower court. In short, the court found that parties entered into the written employment agreement, it found what was due, and lastly it found that it was not "altered, amended or modified by the parties by any new writing, or by any executed agreement or otherwise." In so finding it ruled against every contention made by defendant. The defendant submitted no findings of fact or conclusions of law to the lower court. This court in its appellate review of the trial court's decision is committed to the "clearly erroneous" standard as set forth at length in the case of In re Estate of Hobelsberger, 85 S.D. 282, 181 N.W.2d 455, at pages 458 and 459. We conclude that the entire evidence before the court was such that we cannot under the rule set aside any finding made by the court except the amount of the judgment which we have heretofore in Part II held should have been based on present worth. However, insofar as the judgment entered herein on December 31, 1969 was not based on the present worth standard of the installment payments, which were due at a future date from date of judgment, it was erroneous. If at this time any payments were not due, we would remand to the trial court with directions to enter judgment based upon such standard. However, they are now all due and we therefore remand the action for entry of a judgment for the amount now due. The judgment is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

All the Judges concur.