443 N.W.2d 627 (1989)
In the Matter of the ESTATE OF Ingrid I. PINA, Deceased.
Sylvia B. PINA and Sophia Pina, Petitioners and Appellees,
v.
Eugene FLAGLORE, Respondent and Appellant.
No. 16265.
Supreme Court of South Dakota.
Considered on Briefs March 20, 1989.
Decided June 28, 1989.
*628 Dale L. Mormon of Mormon, Smit, Shepard & Hughes, Sturgis, for petitioner and appellee Sylvia B. Pina.
Michael A. Jackley of Jackley & Flint, Sturgis, for petitioner and appellee Eddie Pina, Guardian ad Litem for Sophia Pina.
James W. Olson and Jeffrey P. Maks of Wilson, Olson & Nash, P.C., Rapid City, for Estate of Ingrid I. Pina, Deceased, and respondent and appellant Eugene Flaglore.
MILLER, Justice.
In this appeal, we affirm the trial court and hold that (1) an heir failed to establish a gift causa mortis of certain estate property; (2) the trial court did not improperly admit into evidence a certain letter which also contained settlement proposals; and (3) there was sufficient evidence to support the trial court's removal of the executor.

FACTS
Ingrid I. Pina (decedent) died in November 1986. At that time, her survivors included four children: Eugene Flaglore (Eugene), Peggy Flaglore (Peggy), Sylvia Pina (Sylvia) and Sophia Pina (Sophia). Decedent's will named Eugene as executor and he subsequently was appointed by the court to that position over the objection of Sylvia and Sophia.
The assets of the estate included decedent's residence and certain nursing home property located in Sturgis, South Dakota. It also included personal property located at her residence and the nursing home and specific items from an antique business, which were stored in a building owned by Pyramid, Inc. in Sturgis. Eugene and his wife Nancy currently own more than 77% of the stock in Pyramid, Inc.
Prior to her death, decedent transferred her one-third ownership in Pyramid, Inc. to her children and also delivered the certificates of title to four automobiles (which include a 1958 Corvette and a 1969 Corvette) to Eugene. The parties dispute what decedent intended by the delivery of the titles. Eugene asserts that certain automobiles were to be distributed to family members according to the instructions of decedent unless his sisters caused a dispute concerning the distribution of the estate; in that event, Eugene was to keep the cars for himself. Sylvia and Sophia assert that the automobiles were to be kept by the estate and were to be sold in the event that the estate needed to raise cash; if such action was not necessary, then the cars were to be distributed to family members.
Shortly after decedent's death, Eugene took over the operation of the Pina Nursing Home, which was formerly operated by decedent. Prior to decedent's death, the nursing home was a successful business, operating at a profit of $24,787 in the previous year. The next year, when Eugene operated the nursing home, it had comparable receipts but operated at a loss.
Decedent's children were in constant disagreement concerning the estate's administration. Points of contention included not only Eugene's signing of the certificates of title to the Corvettes over to himself and the deficit operation of the nursing home, but also included the terms of the proposed sale of the nursing home, Eugene's use of the nursing home checking account for the purposes of both the nursing home and the estate, and his proposal to pay off the estate's largest creditor, Pyramid, Inc., over a claim by First Western Bank (Bank).
Bank held a $25,000 note against the estate on which payment had not been made for at least a year and a half. At the same time, a $43,000 claim against the estate was filed by Nancy Flaglore (Eugene's wife) as secretary of Pyramid, Inc. Eugene submits that this claim is for the storage of decedent's antiques in a building owned by the corporation. It appears from the record that no written agreement existed concerning the storage of the antiques or the rental charge therefor. Eugene, as executor, intended to approve and pay Pyramid, Inc.'s claim at the same time that the estate had an outstanding and unsatisfied obligation to Bank.
*629 Concerning the sale of the nursing home, Eugene proposed that the buyer make a $70,000 down payment, with those funds to be borrowed and secured by a first mortgage against the nursing home. The subsequent payments were to be covered by a note and a second mortgage to the estate. In effect, the buyer would have been able to take possession without any personal investment or initial cash input into the estate. This proposal was rejected by Sylvia and Sophia. A later proposal was accepted under which the buyer made a down payment of $40,000 with the balance to be paid in monthly installments.
After Eugene came into possession of the $40,000 down payment, the outstanding note at Bank was in excess of $27,000. However, rather than paying Bank, Eugene elected to pay himself $5,000 in executor fees and another $7,000 was paid in attorney fees. The remainder of the money was used to satisfy other debts and obligations, including payment of sales taxes, outstanding bills, satisfaction of a contract for deed, and funeral expenses.
Sylvia and Sophia moved to have Eugene removed as executor. After a hearing, the court dismissed Eugene based upon his misconduct and mismanagement of the estate, the conflict of interest created by his actions as executor and the claim of Pyramid Inc., his deficit operation of the nursing home, his operation of the nursing home and the estate through the same bank account, and his transfer of the automobiles. The court, sua sponte, also ordered that the titles to the Corvettes be placed in escrow with the clerk of courts. Eugene appeals.

DECISION

I

WHETHER THE TRIAL COURT HAD JURISDICTION OVER THE AUTOMOBILES.
Eugene first asserts that the trial court did not have jurisdiction over the automobiles because the titles were delivered to him prior to the death of decedent and were intended as a gift causa mortis to him. A gift causa mortis is "one which is made in contemplation, fear, or peril of death, and with the intent that it shall take effect only in case of the death of the giver." SDCL 43-36-4. In order to make a gift causa mortis, there must be a clear and intelligent manifestation of an intention to make a present gift to another and a delivery of the property to or for the use of the intended donee. See Steffen v. Davis, 52 S.D. 283, 217 N.W. 221 (1927). Eugene asserts that it was decedent's intent that the automobiles not pass through the estate or by the provisions of her will; rather, she expressed specific desires about who was to receive each of the cars. Eugene further asserts that the titles were given to him with the specific instructions to hold them until the final settlement of the estate; if the estate was settled amicably, the automobiles were to be distributed in conformity with decedent's instructions. However, according to Eugene, if a dispute arose in settling the estate, then he was to retain the cars as his own.
Sylvia and Sophia correctly assert that the burden is on Eugene to prove that the automobiles were intended as a gift causa mortis, including proof of both donative intent and delivery. Matejka v. Reider, 62 S.D. 335, 252 N.W. 878 (1934); see also O'Gorman v. Jolley, 34 S.D. 26, 147 N.W. 78 (1914). Sophia and Sylvia allege that the cars were never intended to be a gift causa mortis to Eugene, but were to be held by him pending the completion of the probate of the estate and that they were to be liquidated in the event that the estate needed to raise cash. They assert that these instructions from decedent did not manifest her intent to give the cars to Eugene.
We note that both Sylvia and Eugene agreed and testified to the fact that decedent wanted the cars to be sold in case the estate was in need of money. We note further that Eugene alone testified that he was to keep the automobiles for himself in the event that the estate could not be settled amicably. This assertion can only be found in his testimony at the hearing and cannot otherwise be corroborated.
Viewing the record in its entirety, we do not believe that Eugene has met his burden *630 of proving donative intent. Matejka, supra. Further, because the automobiles were to be retained in case the estate needed an infusion of cash, they obviously had to be included within the estate. We therefore hold that the cars remained the property of estate and thus were within the jurisdiction of the trial court. Further, because of their unique value, we find that the court did not err in ordering that the certificates of title be delivered to the clerk.

II

WHETHER THE TRIAL COURT ERRED IN ADMITTING A PORTION OF A LETTER WHICH CONTAINED SPECIFIC SETTLEMENT PROPOSALS.
During the hearing, Eugene testified concerning a conversation between decedent, Sylvia, Sophia, and himself, among other people, regarding the distribution of the automobiles in the event that the estate was not in need of any funds. At the hearing, counsel for Sophia and Sylvia offered into evidence a portion of a letter that was written by Eugene's counsel. The letter, among other things, synopsized the decedent's intended distribution of the automobiles in the event that they did not need to be sold and was offered for the limited purpose of showing that statement of fact. The specific portion of the letter which counsel sought to introduce read:
The inventory of property in the house at Douglas Street would all go to the two girls and the vehicles would be distributed as outlined by Ingrid and as I explained in Sturgis, with the Ford Fairmont going to Sophia, the 1958 Corvette going to Sylvia, the 1968 Corvette going to Gene and Sophia, the Volkswagon to Sylvia and Sophia, and the 1950 Chevrolet to Gene.
Eugene objected to the admission of the letter because it constituted a proposed settlement and distribution of the cars. As such, Eugene contends its admission is prohibited by SDCL 19-12-10, which states:
Evidence of
(1) furnishing or offering or promising to furnish, or
(2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This section does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This section also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution. (Emphasis added.)
Eugene asserts that the letter's introduction is prohibited because of the tenor of the entire letter. We disagree. The record does not indicate that there was any dispute concerning ownership of the automobiles by decedent or their distribution after her death. Sylvia and Sophia assert, and Eugene concedes, that the automobiles were to be distributed according to the scheme set forth by decedent, and we previously held that they did not pass from decedent's ownership at the time she gave the certificates of title to Eugene. That portion of the letter which counsel attempted to introduce was an undisputed factual assertion and was otherwise discoverable. As such, it is not rendered inadmissible under SDCL 19-12-10. See Erickson v. Webber, 58 S.D. 446, 449, 237 N.W. 558, 559 (1931); United States v. Reserve Mining Company, 412 F.Supp. 705, 712 (D.Minn.1976); and 31A C.J.S. Evidence § 287 (1955).

III

WHETHER THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE TRIAL COURT'S REMOVAL OF THE EXECUTOR.
Eugene next asserts that there was insufficient evidence to warrant his removal *631 as executor. Eugene correctly states that our standard of review requires that we uphold the trial court unless we determine that the findings upon which it relied are clearly erroneous. Vaughn v. Eggleston, 334 N.W.2d 870 (S.D.1983). Under Vaughn, a factual determination of the trial court will be disturbed only when, after reviewing all of the evidence presented, we are left with a definite and firm conviction that a mistake has been made.
The trial court determined that Eugene mismanaged decedent's estate due to his failure to keep separate accounts for the estate and the nursing home, his operation of the nursing home at a deficit, his misconduct based upon the transfer of the automobiles, and the conflict of interest based upon the claims of Pyramid Inc. and Bank. Perhaps the most alarming fact raised at the circuit court level was the increase in the expenses for the administration of the nursing home and estate. The amount expended for food at the nursing home increased by more than fifty percent during the time that Eugene served as administrator. Further, the amount expended in wages increased from $6,481 during the last year that decedent operated the nursing home to more than $30,000 during the one-year period when it was operated by Eugene. We recognize, however, that decedent during her lifetime operated the nursing home with little outside help and that Eugene could not operate the nursing home in the same manner. Regardless, adding his "management fee" to the cost of hiring additional help to operate the nursing home on a day-to-day basis constitutes a massive increase in the cost of operating the facility.
Mismanagement is further evidenced by its attempted sale in a scheme which essentially did not require that the buyer invest any of his own capital and would not have provided the estate with any initial cash input. We believe that such a transaction, due to its structure, would have been an immense liability to the estate.
The trial court also found that Eugene had breached his fiduciary duty as executor of the estate by commingling the estate's funds in the nursing home account. SDCL 55-5-1 provides:
In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property for the benefit of another, a fiduciary shall exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital.
As executor of the estate, it is obvious that Eugene acted in a fiduciary capacity. See In re Estate of Scheibe, 35 Wis.2d 89, 150 N.W.2d 427 (1967). As such, he was required to act in accordance with SDCL 55-5-1. We agree with the trial court that Eugene breached his fiduciary duty when he commingled the funds of the estate and the nursing home, especially in light of the extraordinary increase in expenses attendant to the home's operation. Such commingling, while not creating an insurmountable obstacle to auditing the estate's transactions, could make such an accounting tremendously more difficult.
We also believe that Eugene breached his fiduciary duty as executor when he intended to approve and pay the full claim of his own corporation, Pyramid, Inc., before paying the estate's other largest creditor, Bank. While an executor may make a claim against the estate if he is a creditor under SDCL 30-21-35, we believe that Eugene's actions constitute an attempt to benefit himself at the expense of the other creditors. As such, he had a blatant conflict of interest which was inconsistent with his duties as executor.
The trial court had an opportunity to weigh the credibility of the witnesses. It also was able to discern the animosity between Eugene, Sophia, and Sylvia. The court also had ample opportunity to review the abundance of evidence concerning the estate's financial condition and the transactions into which Eugene had entered on behalf of the estate. Our review of the record does not convince us that the trial *632 court erred in removing Eugene as executor.
Affirmed.
WUEST, C.J., and MORGAN and SABERS, JJ., concur.
HENDERSON, J., concurs in result.
HENDERSON, Justice (concurring in result).
SDCL 19-12-10 is adopted from Federal Rule of Evidence 408. This was accomplished in 1966. Erickson was written long before the enactment of SDCL 19-12-10. However, it appears to be in sync with the federal rule, our state statute, and the facts before us. I note that this was a court trial, and when an action is tried to the court, the presumption is that improperly admitted evidence is disregarded. Hagin v. DeGeest, 85 S.D. 418, 185 N.W.2d 478 (1971). Here, the trial court received only a portion of the letter. As SDCL 19-12-10 expresses:
Evidence of
(1) furnishing or offering or promising to furnish, or
(2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible....
It would be extremely dangerous for negotiation letters, either before or during litigation, to be displayed to a jury. Lawyers would be afraid to negotiate and so would lay people. To excise, neatly and nicely, the bad from the good (admissible from inadmissible) in a communication requires a finely honed legal scalpel. It can be done, competently, by a circuit court judge in a trial to the court. Additionally, he/she has the benefit of the Hagin rule. In a jury trial, this is a far more difficult task, as the inadmissible and admissible may be inextricably interwoven in the fabric of the exhibit. What, then, does the trial judge do? Does he use a scissors or razor blade? Does he rationalize: "There's no way for me to nicely cleave, so I reject admission of the exhibit entirely." This admissibility/inadmissibility question can present an extremely difficult position for a trial judge. One device, employed by some judges, is to block out the inadmissible. This can be dangerous also, because it can destroy the true meaning of the exhibit, and the jury may be left in a state of bewilderment as to the overall intent of the message in the particular instrument. Each exhibit and set of facts must be decided to produce truth, and not to mechanically serve a rule of evidence.