1996 SD 113

**Gary WARD, as Agent of the Estate of Walter O'Keefe, Deceased, Plaintiff and Appellee,**

v.

**Gail LANGE and Loren Lange, Defendants and Appellants.**

No. 19295.

Supreme Court of South Dakota.

Considered on Briefs May 23, 1996.

Decided Sept. 4, 1996.

Dennis Duncan and Jeffrey Cole of Zimmer, Duncan and Cole, Parker, for plaintiff and appellee.

Kenneth D. Bertsch of Ulmer, Hertz & Bertsch, Menno, for defendants and appellants.

KONENKAMP, Justice.

[¶1] This case requires us to determine the extent to which individuals contracting with elderly, impaired persons may become liable as fiduciaries. Defendants, having been found as a matter of law to have acted in a fiduciary capacity in dealings with their uncle, appeal an adverse jury verdict. We affirm.

## BACKGROUND

[¶2] Walter O'Keefe was 101 years old when he died on November 12, 1992. A retired farmer, he had been residing at the Pioneer Memorial Hospital and Nursing Home in Viborg since 1983. During those years, most of his personal and financial affairs were handled by his half-sister, Vera Lange, acting by power of attorney. Walter had three income sources: social security, a veteran's pension stemming from his service in World War I, and rental income on 540 acres of farmland in Turner County. Originally the fee owner, Walter in 1981 deeded 300 acres to Vera and 80 acres each to Vera's three children, Gail and Loren Lange, and Bernetta Woelz, reserving to himself a life estate in the property. The land was leased at $10 to $15 an acre, with the income used to pay real property taxes and the balance for Walter's care.

[¶3] A tenant contacted Vera in 1989 about having the lease property irrigated. Vera herself was not interested, but Gail and Loren saw it as an opportunity. Loren told his mother, "Well, I will tell you what I will do, I will put up the money [by pledging his CD as security for a loan] ... [t]hat will cover the money we need if after operating expenses are done the remainder of the money goes back to satisfy this note." Dealing with Vera, as Walter's agent, in 1989, 1990, and 1991, Gail and Loren arranged for leases authorizing the placement of irrigation units on 400 acres of the land, considerably increasing its rental value. They then sub-

leased the property back to the original lessees on more lucrative terms, but kept all the proceeds to pay on the loan for installing the irrigation equipment. Loren was later asked: "What was Walter O'Keefe supposed to get out of this transaction?" He replied:

Well, Walter O'Keefe was going to retain the same cash payments that he had always been getting. Had we not put the well in, he would have been getting $10 an acre, so he continued to get the same amount.

Yet due to an "oversight," as Loren put it, no rental funds were set aside for Walter for several years. With these leases on Walter's life estate property, Gail and Loren Lange collected a total of $54,870 in net profit. They declare it was used to repay their irrigation loans. On September 3, 1991, two days before Vera's death, Gail and Loren had Walter give them his power of attorney. Thereafter, they handled all his personal and financial affairs. At the same time, Loren acted as executor for Vera's estate and the brothers continued the same arrangement on the life estate, leasing the property from Walter.

[¶4] Vera had $61,298.02 in three bank accounts. One account was in her name only and the other two were joint accounts with Gail. The two joint accounts totalled $35,137. Bank records reveal that over the years $54,468 of Walter's income had been deposited into these joint accounts. Gail and Loren took $18,000 from one of the joint accounts to purchase a $25,000 certificate of deposit in their names. According to them, interest earned on the CD was to be set aside for Walter's benefit. The account in Vera's name was the only one Loren originally reported on the South Dakota Inheritance Tax Return.[1] Upon Walter's death in November 1992, Gail was appointed as agent for Walter's Estate.

[¶5] Aggrieved by what she suspected were improprieties, Gail and Loren's sister, Bernetta, petitioned the court for an exami-

---

1. The other two accounts were eventually reported as part of Vera's Estate on November 29, 1993, but only after allegations of wrongdoing were lodged.

nation pursuant to SDCL 30–17–4.[2] A hearing was held on June 13, 1993. Gail later resigned as agent and Gary Ward was appointed in his stead, and in that capacity, he brought the present action against Gail and Loren, seeking both compensatory and punitive damages for breach of fiduciary duty, conversion, fraud and deceit.

[¶ 6] As part of the Estate's motion for summary judgment, counsel presented bank records, probate documents, deposition transcripts, answers to interrogatories, medical records, and affidavits from experts, including one from an appraiser and another from an experienced attorney-trust officer, who opined that Gail and Loren acted in a fiduciary capacity for Walter since 1988. In response, Gail and Loren submitted no affidavits or other opposing evidence, but contended that based on the state of the record material issues of fact precluded granting the motion. The circuit court granted summary judgment on liability.

[¶ 7] At the trial on damages Gail and Loren said they believed their mother's joint accounts held none of Walter's money and that the leases they arranged on Walter's life estate were fair. They also maintained that Walter's caretaking expenses exceeded his income, but they nonetheless stood by their promise to Vera to take care of Walter. Yet the Estate submitted evidence that Walter's income from 1983 to his death exceeded his expenses every year, with a total surplus of almost $63,000. The jury returned a verdict for the Estate: $75,000 compensatory and $25,000 punitive damages.

[¶ 8] Gail and Loren raise the following issues on appeal:

I. Whether the court erred in granting partial summary judgment on liability.

II. Whether the court erred in excluding evidence concerning the wills of Walter O'Keefe and Vera Lange.

III. Whether the court erred in excluding testimony regarding possible

gifts from Walter O'Keefe to Vera Lange.

IV. Whether the court erred in excluding attorney testimony.

## ANALYSIS

### [¶ 9] I. Partial Summary Judgment on Liability

[¶ 10] Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." SDCL 15–6–56(c); *Aetna Life Ins. Co. v. McElvain,* 363 N.W.2d 186, 188 (S.D.1985). We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. *Bego v. Gordon,* 407 N.W.2d 801, 804 (S.D.1987). All reasonable inferences drawn from the facts must be viewed in favor of the nonmoving party. *Morgan v. Baldwin,* 450 N.W.2d 783, 785 (S.D.1990). The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law. *Wilson v. Great N. Ry. Co.,* 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968). On the other hand, "[t]he party opposing a motion for summary judgment must be diligent in resisting the motion, and mere general allegations and denials which do not set forth specific facts will not prevent issuance of a judgment." *Breen v. Dakota Gear & Joint Co., Inc.,* 433 N.W.2d 221, 223 (S.D.1988). We address each liability theory.

### [¶ 11] *A. Breach of Fiduciary Duty*

[¶ 12] Although Gail and Loren concede they were acting in a fiduciary capacity for Walter after September 3, 1991, when they obtained his power of attorney, they contend the court erred in ruling a fiduciary relationship existed before that time and in concluding as a matter of law that they had

---

**2.** SDCL Ch. 30–17 was repealed upon adoption of the Uniform Probate Code.1995 Sess.L. ch. 167, § 161.

breached any fiduciary obligations.[3] We recently restated what comprises a fiduciary relationship:

A fiduciary relationship is founded on a "peculiar confidence" and trust placed by one individual in the integrity and faithfulness of another. When such relationship exists, the fiduciary has a "duty to act primarily for the benefit" of the other. "Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary." South Dakota law reflects "the traditional view that fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act primarily for another's benefit. The law will imply such duties only where one party to a relationship is unable to fully protect its interests and the unprotected party has placed its trust and confidence in the other." We recognize no "invariable rule" for ascertaining a fiduciary relationship, "but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other."

*High Plains Genetics Research, Inc. v. JK Mill–Iron Ranch,* 535 N.W.2d 839, 842 (S.D. 1995) (quoting *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 839 (S.D.1990) and *Taggart v. Ford Motor Credit Co.,* 462 N.W.2d 493, 500 (S.D.1990)). "The existence of a fiduciary duty and the scope of that duty are questions of law for the court." *Id.* at 842. Whether one breached a fiduciary duty, however, is a question of fact. *American State Bank v. Adkins,* 458 N.W.2d 807, 811 (S.D.1990). Nevertheless, the trial court found the various contrivances so undisputed as to render the issue determinable as a matter of law, leaving the extent of any damage to the Estate as the only factual question.

[¶ 13] Gail and Loren argue that because they dealt with their mother, who acted as Walter's representative before her death, any breach of fiduciary responsibility before 1991 falls on her head, not theirs. While it is true Vera consented to setting up the irrigation leases and agreed to allow her sons to divert the increased rental income, Gail and Loren cannot absolve themselves of their shared responsibility. They admitted Walter was unable to handle his own affairs and required assistance. Gail and Loren knew their mother, who was in her eighties, wanted to protect Walter's income so he would have his caretaking expenses paid. They even maintained that adding the irrigation units was done partly for their uncle's benefit; by making the lease property more arable, it would guarantee he would continue to receive the $10 to $15 per acre rent. This was no arm's length business deal: Walter was dependent on Vera, and Vera, quite elderly herself, relied on her sons to help her sustain Walter. *High Plains,* 535 N.W.2d at 842.

[¶ 14] Using Vera to sign leases for Walter, Gail and Loren subleased the life estate property, securing for themselves increased rents. They effectively stepped into Vera's shoes, managing the life estate so their uncle would get the rent he had been receiving, but using the increased payments to pay off their investment, thus enriching the value of property that would eventually devolve to them. Most often, deciding whether a fiduciary relationship was breached is properly left to the trier of fact. *American State Bank,* 458 N.W.2d at 811. In this case, however, considering the generally undisputed state of the record, the nature of the transactions, the family relationship of the parties, Walter's age and condition, as well as Vera's circumstances, we conclude the trial court correctly ruled Gail and Loren breached a fiduciary duty while dealing with Vera to lease Walter's life estate property.

[¶ 15] After Vera's death, Gail and Loren fully controlled Walter's finances, including

3. Whether Walter had sufficient mental capacity to grant a power of attorney is doubtful. He was 100–years–old at the time and by all accounts his memory and thinking were impaired. For pur-

poses of this appeal, however, the parties have focused upon how the power of attorney was used, not whether it was validly given.

his life estate rental income. As they readily concede, a fiduciary relationship unquestionably existed at that time. As fiduciaries, Gail and Loren were obliged to "act in the highest good faith" without obtaining any undue advantage. SDCL 55–2–1; 55–2–6.

> The trustee violates his duty to the beneficiary not only where he sells trust property to himself individually, but also where he uses the trust property for his own purposes. Thus, he cannot properly use trust money in his business, or lend trust money to himself, or lease to himself land which he holds in trust.

RESTATEMENT (SECOND) OF TRUSTS, § 170, cmt. 1. Loren and Gail both knew their mother handled Walter's business affairs, collecting and paying out money for his care. Given the fact Vera held money in trust for Walter, Loren was obligated to carefully administer the accounts to ensure they were not commingled or misapplied. *See* SDCL 55–2–2.

> A personal representative is obligated to carry out many duties during the probate of an estate. Generally speaking, he must qualify as personal representative, inventory the assets, collect the assets, manage the assets while in his possession, allow and pay claims, and distribute the remainder of the estate. A personal representative acts in a fiduciary capacity on behalf of all parties who have interests in the estate including heirs and creditors. *Matter of Estate of Pina*, 443 N.W.2d 627 (S.D.1989). A personal representative is obligated to use the same care and skill in managing an estate that a reasonably prudent man would utilize in the management of his own affairs.

*Christie v. Dold*, 524 N.W.2d 866, 871 (S.D. 1994). After their mother died and they took direct control over Walter's affairs, they continued to sublease the properties, reaping the increased cash rent, without making an accounting of the proceeds. Gail and Loren believe they were only improving the value the estate without harming anyone, but by its verdict the jury evidently found they benefit-ed themselves to the Estate's detriment. They also commingled Walter's funds with their own. Their actions after obtaining Walter's power of attorney and in mismanaging Walter's funds in Vera's estate constituted a breach of specific fiduciary duties and we see no error in the circuit court's finding of liability as a matter of law.

[¶ 16] ***B. Conversion***

 [¶ 17] "Conversion is the act of exercising control or dominion over personal property in a manner that repudiates the owner's right in the property or in a manner that is inconsistent with such right." *Scherf v. Myers*, 258 N.W.2d 831, 834 (S.D.1977). Approximately $18,000 acquired by Gail and Loren through their mother's estate was used to purchase a $25,000 CD in their names. If Gail and Loren once believed they were entitled to these funds, their answers to interrogatories demonstrate any inquiry would have shown that substantial money deposited in the account was from Walter's social security, pension and rental incomes.[4] Intent is not a required element for conversion under SDCL 21–3–3. *See Rensch v. Riddle's Diamonds of Rapid City, Inc.*, 393 N.W.2d 269, 271 (S.D.1986)("Intent or purpose to do a wrong is not a necessary element of proof to establish conversion."). Gail and Loren failed to present any material facts to contravene the summary judgment motion. We find no error.

[¶ 18] ***C. Fraud and Deceit***

 [¶ 19] Claims of fraud and deceit are normally questions for a jury. *Tri–State Ref. and Inv. Co., Inc. v. Apaloosa Co.*, 431 N.W.2d 311, 314 (S.D.1988) ("A claim for fraud and deceit is generally a question of fact for the fact finder."). Once more, we repeat the rule that a party opposing a motion for summary judgment must present facts which demonstrate a genuine, material issue for trial. *Laber v. Koch*, 383 N.W.2d 490, 492 (S.D.1986). Mere general allegations and denials will not prevent issuance of summary judgment. *Breen*, 433 N.W.2d at 223. Considering the entire record, we must

---

**4.** The bank records unequivocally proved some funds in the accounts were derived from Walter's income sources. Loren and Gail continued to maintain throughout the trial and in this appeal that the bank accounts were their mother's and hence they had no duty to investigate or account.

decide whether there exists any basis supporting the trial court's ruling. *Piner v. Jensen*, 519 N.W.2d 337, 339 (S.D.1994).

[¶ 20] SDCL 55–2–7 states: "Every violation of the provisions of §§ 55–2–1 to 55–2–6, inclusive, is a fraud against the beneficiary of the trust." Uncontradicted facts established Gail and Loren violated statutorily mandated fiduciary duties. *Cf. Robinson v. Roinstad*, 43 S.D. 436, 180 N.W. 67 (1920) (estate administrator acts as a trustee). SDCL 20–10–1 provides:

> One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.

A "deceit within the meaning of § 20–10–1 is ... [t]he suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact[.]" SDCL 20–10–2. The complaint alleged Gail and Loren "willfully designed to deceive Walter O'Keefe's Estate" by failing to disclose facts regarding Walter's income, resources, and funds. Evidence in the record supports this allegation. They were intimately involved with his financial situation after obtaining the power of attorney and after his death. Gail and Loren gave no plausible explanation for their failure to investigate and account to the Estate, only that they "used no money for our own purpose." All other matters they offer as genuine issues of material fact go toward the issue of damages, an issue properly left for the jury. We uphold the court's ruling.

[¶ 21] **II. Wills—Relevancy**

[¶ 22] Gail and Loren sought to present the wills of Vera and Walter at the damages trial. They contended the wills were relevant to compensatory and punitive damages, because two-thirds of any funds awarded would be returned to them as beneficiaries: "[a]dmission of the wills would have shown the jury that the Langes had no reason to steal; in effect, they would have been stealing from themselves. Instead, the jury was left to speculate on who suffered any final harm." The court granted the Estate's motion in limine to exclude reference to these wills.

[¶ 23] Much of the misfeasance took place before Gail or Loren could have inherited under the wills. "A will does not confer any present right at the time of its execution, and nothing vests by reason of such an instrument during the life of the testator. Until the death of the maker it is ambulatory and revocable." *Northwestern Nat. Bank of Sioux Falls v. Daniel*, 80 S.D. 528, 530, 127 N.W.2d 714, 715 (1964) (quoting 57 AmJur *Wills* § 15, p. 48). After both Vera and Walter passed away, Gail and Loren acted in a representative capacity for the Estates. They apparently make no distinction between themselves as heirs and the Estates to which they had a legal obligation. Moreover, their sister, Bernetta, was a beneficiary and to the extent they misappropriated Estate assets, she suffered a consequent detriment. The trial court reasoned that while a portion of the damage award may eventually go to Gail and Loren, it was not relevant to the amount of Estate damages. The only issue for the jury was the loss the Estate suffered, if any, due to Gail's and Loren's actions. We review evidentiary rulings for abuse of discretion. *State v. Hanson*, 456 N.W.2d 135, 138 (S.D.1990); *State v. Olesen*, 443 N.W.2d 8, 9 (S.D.1989). The term "abuse of discretion" refers to a discretion exercised to an end or purpose not justified by, and against, reason and evidence. *State v. Flying Horse*, 455 N.W.2d 605, 608 (S.D.1990); *Herndon v. Herndon*, 305 N.W.2d 917, 918 (S.D.1981). We find no abuse of discretion in the circuit court's evidentiary ruling.

[¶ 24] **III. Gifts**

[¶ 25] The circuit court granted the Estate's motion in limine, excluding testimony about purported gifts from Walter to Vera, subject to a later showing of relevancy. As part of an offer of proof, Loren testified:

Q During the course of Vera's life do you have any knowledge of gifts that were made to Vera Lange?

A I know that back in the late '70's Walter O'Keefe made a $10,000 gift to my mother and a $5,000 gift to my dad.

Q And regarding—You have heard some testimony in this matter previously by Mr. Ward where there was some income checks from the real estate deposited to Vera Lange's account. Do you believe any of those deposits were also gifts?

A They could have been.

Q And why do you say that?

A Well, I just—You know, I don't know what else they would have been.

Q Did Walter make gifts to your mother prior to 1980 other than the $15,000 or the $10,000 you just mentioned?

A I don't know.

In denying their offer the circuit court ruled:

Well, as far as any gifts being made, the offer of proof basically established that in the late '70's Walter gave $10,000 to Vera Lange and $5,000 to Ray Lange. And taking that evidence in the light most favorable to the defendants, I believe that. But I don't think it is relevant to what we are doing here today. That is prior to any time frame that we are dealing with. There is no showing that in the '80's that Walter O'Keefe made gifts, that he had any intent to make gifts, that he did actually in fact make gifts, and that those gifts were accepted.

We see no abuse of discretion in this ruling. No evidence linked the money in the joint accounts to any gifts made in the 1970s. Testimony on these gifts was irrelevant and inadmissible. SDCL 19–12–1; –2 (Rules 401 and 402).

## [¶ 26] IV. Attorney Testimony

[¶ 27] The circuit court refused to permit trial counsel's partner, Tom Hertz, to testify as a witness for the defense, stating "Mr. Hertz cannot testify at the trial and have Mr. Bertsch continue to represent the defendants." Gail and Loren argue Hertz should have been allowed to testify about advice he gave them on the propriety of the irrigation leases. SDCL 19–1–3 precludes this evidence:

When an attorney is a witness for his client upon any trial except as to merely formal matters such as the attestation or custody of an instrument or the like, he shall not further participate in such trial. This section shall not apply when such attorney's testimony is offered in answer to evidence received on behalf of the other party and it shall appear to the satisfaction of the court that such attorney had no reason to anticipate the necessity of his being a witness. . . .

Excluding such testimony avoids potential conflicts of interest. *Jones v. S.D. Children's Home Society*, 90 S.D. 126, 132, 238 N.W.2d 677, 679 (1976). Attorney Hertz could not be a witness because he had a direct interest in the outcome of the case. The statute is clear—counsel cannot testify for a client on a contested issue and continue to represent such client. *Id.* at 132–33, 238 N.W.2d at 679–80. "The roles of an advocate and a witness are totally inconsistent and [the attorney cannot] assume both roles at the same time." *Id.*

[¶ 28] This Court's policy is quite explicit on this point:

[W]e are hereby making it incumbent upon the judges of the circuit court of this state to enforce this provision [SDCL 19–1–3]. Henceforth, if an attorney testifies for his client as to contested matters, neither he nor any member of his firm will be allowed to represent that client at any further proceedings directly relating to that case. If for some reason the attorney does continue to represent the client after becoming a witness, his testimony will be considered incompetent and stricken from the record.

*Id.* Gail and Loren contend the testimony was admissible pursuant to the statutory exception in SDCL 19–1–3, because they "had no reason to anticipate the necessity of his being a witness." We disagree. The complaint included allegations of deceit, fraud, and punitive damages; the defense was good faith and reliance on legal advice might augment a claim of good faith. Furthermore, Gail testified in the estate examination hearing two years before the trial that his attorney had advised him the lease arrangement was legal. We find no abuse of discretion in excluding such testimony.

[¶ 29] Affirmed.

[¶ 30] MILLER, C.J., and SABERS, AMUNDSON and GILBERTSON, JJ., concur.

